**FMC CORPORATION, Plaintiff,**

v.

**VENDO COMPANY, et al., Defendants.**

**And Related Third–Party Claims**

**No. CIV.F–00–5295 OWW LJO.**

United States District Court,
E.D. California.

April 17, 2002.

James Arthur Bruen, Farella Braun and Martel, San Francisco, CA, Stephen Roy Cornwell, Cornwell and Sample, Fresno, CA, for FMC Corp.

Stephen Terry Holzer, Parker Milliken Clark OHara and Samuelian, Los Angeles, CA, Mark E. Elliott, Pillsbury Madison and Sutro, Los Angeles, CA, for Vendo Co.

Chrisptopher J. McNevin, Mark E. Elliott, Pillsbury Madison and Sutro, Los Angeles, CA, for Vendorlator Mfg. Co.

Stephen Terry Holzer, Parker Milliken Clark OHara and Samuelian, Los Angeles, CA, Mark Fall, Jones Day Reavis and Pogue, Los Angeles, CA, Kevin P. Holewinski, Pro Hac Vice, Curt Vazquez, Pro Hac Vice, Jones Day Reavis and Pogue, Pittsburgh, PA, for Weir Floway Inc.

John F Barg, Barg Coffin Lewis and Trapp LLP, San Francisco, CA, for Burlington Northern Santa Fe R. Co.

MEMORANDUM OPINION AND ORDER RE: BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc.194); THE VENDO COMPANY'S MOTION TO QUASH BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY'S PROPOSED SUBPOENAS OF FMC CORPORATION'S EXPERTS (Doc.199); BNSF'S APPLICATION TO MODIFY THE SCHEDULING ORDER

WANGER, District Judge.

Before the court is third-party defendant Burlington Northern and Santa Fe Railway Company's ("BNSF") motion for

summary judgment and the Vendo Company's motion to quash BNSF's proposed subpoenas of Plaintiff FMC Corporation's experts. *See* Docs.194, 199, filed March 6, 2002. Also before the court is BNSF's application to modify the scheduling order, lodged February 12, 2002, and originally heard on shortened time on February 20, 2002. Oral argument was heard April 8, 2002.

## I. BACKGROUND

BNSF contends trichloroethene ("TCE") and chromium contamination emanated from a site at 2924 South Railroad Avenue in Fresno, California (the "Vendo/Floway site," or the "Floway site"), now owned by Floway, and migrated into groundwater underlying BNSF's property at East Church Avenue and East Avenue (the "BNSF site," or the "Calwa Ice House site").[1] Plaintiff FMC Corporation ("FMC") is the owner of property at 2501 South Sunland Avenue in Fresno (the "FMC site"). The FMC site, the Floway site, and the BNSF site are clustered together along the "Railroad Avenue Corridor."

On February 23, 2000, FMC filed a Complaint against Weir Floway ("Floway") and two companies that, according to BNSF, conducted operations at the Floway site: Vendo Company ("Vendo") and Vendorlator Manufacturing Company ("VMC").[2] *See* Doc.1, Complaint. FMC filed a First Amended Complaint ("FAC") on May 19, 2000. *See* Doc.8. FMC alleges groundwater, which FMC is being required by state administrative agencies to remediate, is contaminated with TCE and chromium as a result of operations at the Floway site. *See* FAC. FMC seeks contri-

bution under section 113(f) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9613; injunctive relief under section 7002(a)(1)(B) of the Resource Conservation and Recovery Act (the "RCRA"), 42 U.S.C. section 7002(a)(1)(B); declaratory relief under section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2); contribution under the Carpenter–Presley–Tanner Hazardous Substance Account Act ("HSAA"), California Health and Safety Code § 25363; and indemnity, contribution, declaratory relief, and damages (under theories of continuing nuisance and trespass) under California state law. *See id.*

On October 11, 2000, Vendo and VMC filed a third-party complaint against BNSF. *See* Doc.37. On October 13, 2000, Floway filed a third-party complaint against BNSF. *See* Doc.38. Vendo and VMC's third-party complaint alleges chromium was and continues to be released into the soil and groundwater from the BNSF Calwa Ice House site. *See* Doc.37 at ¶ 26. Vendo and VMC allege BNSF and other third-party defendants released and disposed of wastes containing TCE and/or chromium at their respective sites which migrated to groundwater under the FMC site. *See id.* at ¶¶ 62–64. Vendo and VMC seek contribution under section 113(f) of CERCLA, 42 U.S.C. section 9613(f), and declaratory relief for an equitable allocation of past, present, and future response costs under section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2). *See* Doc.37.

Floway's third-party complaint alleges TCE and chromium were used in opera-

---

**1.** In Vendo and VMC's third-party complaint, the BNSF site is alleged to be "located adjacent to East Church Avenue between South Railroad Avenue and Sunland Street in Fresno, California at 2950 East Church Avenue, Fresno, California." Doc.37 at ¶ 16.

**2.** Vendo, VMC, and Floway collectively are referred to variously as "Defendants," "Third–Party Plaintiffs," "Third–Party Complainants," and "Vendo/Floway."

tions at the BNSF site, that there were releases of TCE and chromium from the BNSF site into groundwater, and that BNSF is responsible for all or some of the TCE and chromium groundwater contamination at issue in FMC's claim against Weir Floway. *See* Doc.38. Floway seeks contribution under section 113(f) of CERCLA, 42 U.S.C. section 9613(f), declaratory relief under section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2), contribution and apportionment under HSAA § 25363, and declaratory relief under state law. *See id.* BNSF answered these third-party complaints on December 1, 2000. *See,* Docs.79–80.

On November 13, 2001, BNSF filed a separate suit against Floway, Vendo, and VMC. *See Burlington Northern v. Vendo,* CIV F 01–6434 OWW LJO (E.D.Cal.) (the "RCRA action," or *"BNSF* action"), Doc.1, complaint. On December 17, 2001, BNSF filed a first amended complaint. *See Burlington,* CIV F 01–6434, Doc.14. BNSF alleges the TCE and chromium contamination in the groundwater beneath the Railroad Avenue Corridor resulted from operations at the Vendo/Floway site. *See id.* at ¶ 1. BNSF alleges the California Department of Toxic Substances and Control ("DTSC") issued an Imminent and Substantial Endangerment Order (the "ISE Order") on October 19, 1999, requiring Vendo, VMC, and Floway to investigate and remediate soil contamination on the Vendo/Floway site; to investigate the extent of the groundwater plumes emanating from the Vendo/Floway site; and to take remedial measures to clean them up. *See id.* BNSF alleges Vendo, VMC, and Floway failed to comply with the ISE Order and continued to release chromium and TCE from the Vendo/Floway site which ultimately contaminates groundwater beneath the BNSF site and beyond. *See id.*

BNSF alleges it has incurred costs and will incur additional costs relating to the TCE and chromium contamination caused by Floway, Vendo, and VMC, and that the contamination has diminished the value of its property. *See id.* BNSF asserts claims for injunctive relief under sections 7002(a)(1)(A) and (B) of the RCRA, 42 U.S.C. sections 6972(a)(1)(A) and (B); to enforce the terms of the ISE Order against Vendo, VMC, and Floway; to enjoin them from continuing to endanger health and the environment; and to order them to remediate the Vendo/Floway and BNSF sites. *See id.* at ¶¶ 24–39. BNSF seeks damages under state law claims for nuisance and trespass. *See id.* at ¶¶ 40–53.[3]

On January 24, 2002, Vendo/VMC and Floway answered BNSF's FAC. *See BNSF* action, Docs.22–23. Floway asserted an affirmative defense that BNSF's claims are barred because they are compulsory counterclaims to the third-party claims against BNSF in the *FMC* action. *See BNSF* action, Doc.22 at p. 9:18–19.

On February 8, 2002, counsel for Vendo faxed a letter to BNSF informing BNSF that FMC had reached a settlement with Weir, Vendo, and VMC. *See* Doc.186 at ¶ 2, Exh. A. The letter indicated the settling "parties intend to take certain of the depositions noticed by them off calendar." *Id.* at Exh. A. According to the letter, Vendo and Floway intend to proceed with their third-party claims and/or defenses against BNSF in this case and the related cases, *Burlington Northern v. Vendo,* CIV F 01–6434, and *Zacky Farms, v. FMC Corp., The Vendo Co., Vendorlator Mfg. Co., & Weir Floway, Inc.,* CIV F 01–5380 OWW DLB. *See id.* Vendo indicated its intent to proceed with certain depositions

---

**3.** The paragraphs under BNSF's fifth claim for relief are incorrectly numbered and should be numbered 49–53. *See Burlington,* CIV F 01–6434, Doc.14.

as currently noticed related to those claims and defenses. *See id.*

On February 11, 2002, BNSF requested that Vendo and Floway stipulate to an extension of the pretrial and trial dates in this case. *See* Doc.186 at ¶ 3, Exh. B. Later in the day, BNSF asked Vendo and Floway to stipulate to a scheduling conference on February 15, 2002. *See id.* at ¶ 4, Exh. B. Vendo and Floway declined to so stipulate. On February 12, 2002, BNSF applied to modify the scheduling order in the *FMC* case. *See* Doc.185. Vendo and Floway filed oppositions on February 19, 2002. *See* Doc.190. As amended, the scheduling order specified March 6, 2002, as the deadline for completing fact and expert discovery. *See* Doc.179, filed December 12, 2001. This date was effectively vacated pending resolution of the instant motions. Trial is currently set for May 29, 2002. *See id.*

On March 21, 2002, partial judgment pursuant to Fed.R. Civ.P. 54(b) was entered as to FMC's claims against Vendo/Floway pursuant to the terms of a confidential settlement agreement. *See* Doc. 211. According to the judgment, Vendo/Floway are jointly and severally to pay $3,750,000 to FMC within thirty days of the entry of judgment and perform work required by DTSC. *See* Doc.211. Other terms of the settlement agreement are set forth in a "Deal Point Memorandum," submitted as part of a telephonic hearing on February 15, 2002, in which the parties formally recited their settlement for the record. *See* Doc.197, Exh. B; Doc.192. Pursuant to the terms of the Deal Point Memorandum, Vendo/Floway agrees to investigate, remediate, and achieve hydraulic control of offsite groundwater contaminants other than nitrates, west of the eastern boundary of the BNSF railroad right-of-way and south of the northern edge of East Woodward Avenue. *See id.* FMC agrees to investigate, remediate, and achieve hydraulic control of offsite groundwater contaminants other than nitrates, east of the eastern boundary of the BNSF railroad right-of-way and south of the northern edge of East Woodward Avenue. *See id.* Vendo/Floway agree to pay two-thirds of the amount necessary to settle the *Zacky Farms* action, including a compromised amount of Zacky's net replacement water costs, and investigate and remediate the Zacky parcel. *See id.* FMC agrees to pay the remaining one-third of these costs, unless Vendo/Floway recovers from BNSF, in which case FMC's share drops to one-quarter of these costs. *See id.* FMC agrees not to assist BNSF in its prosecution or defense of the claims between BNSF and Vendo/Floway, "such as by providing BNSF with FMC's attorney work product, expert work product or by waiving any conflict between BNSF and an FMC expert." Doc.197, Exh. D.[4]

## II. *LEGAL STANDARD*

### A. *Summary Judgment*

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *see California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in

---

**4.** The Settlement Agreement provides:

FMC agrees not to aid the prosecution of any pending claim against Defendants by BNSF, or the defense of any pending claim filed by Defendants against BNSF, whether asserted in the FMC Action, Zacky Action, BNSF Action or a potential DTSC action, or in future claims which may be asserted by or against BNSF arising out of the matters which are the subject of this Settlement Agreement, such as by providing attorney work product, expert work product or by waiving conflicts between a litigant and FMC experts, except to the extent required by legal process or order of the Court. . . . Doc.199, Exh. A at ¶ 15.

light most favorable to the nonmoving party. *See Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1107 (9th Cir.2000). Instead, the nonmoving party, through affidavits or other admissible evidence, "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P 56(e).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

Evidence submitted in support of, or in opposition to, a motion for summary judgment must be admissible under the standard articulated in 56(e). Properly authenticated documents can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. *See Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1550–51 (9th Cir.1989). Supporting and opposing affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show that the affiant is competent to testify to the matters stated therein. *See* Fed.R. Civ.P. 56(e).

"Questions of statutory construction and legislative history present legal questions which are properly resolved by summary judgment." *T H Agric. & Nutrition Co. v. Aceto Chem. Inc.,* 884 F.Supp. 357, 359 (E.D.Cal.1995) (citations omitted).

### B. *Summary Adjudication*

Summary adjudication may be appropriate on clearly defined, distinct issues. *See Robi v. Five Platters, Inc.,* 918 F.2d 1439 (9th Cir.1990). Fed.R. Civ.P. 56 allows a party to move for summary judgment on any part of a claim. *See* Fed.R. Civ.P. 56(a)-(d). The purpose of summary adjudication is to salvage some results from the judicial effort involved in evaluating a summary judgment motion and to frame narrow triable issues if the court finds that the order would be helpful with the progress of litigation. *See* Fed.R. Civ.P. 56(d); *National Union Fire Ins. Co. v. L.E. Myers Co. Group,* 937 F.Supp. 276, 284 (S.D.N.Y.1996). An order under Rule

56(d) narrows the issues and enables the parties to recognize more fully their rights, yet it permits the court to retain full power to completely adjudicate all aspects of the case when the proper time arrives. *See* 10B Wright & Miller, Federal Practice and Procedure (3d ed.1998), § 2737 at 316–18. Summary adjudication may be used to dispose of affirmative defenses. *See "Z" v. Worley*, 2001 U.S. Dist. LEXIS 9476 (disposing of affirmative defense to battery claim on summary adjudication); *Sterling Bank v. Sterling Bank & Trust*, 928 F.Supp. 1014 (1996).

The procedure under Rule 56(d) is designed to be ancillary to a summary judgment motion. Unlike Rule 56(c), which allows for interlocutory judgment on a question of liability, Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief. *See* Wright & Miller, § 2737 at 316–18. This aspect of the rule has been confused due to courts' frequently referring to Rule 56(d) orders as "partial summary judgment" rather than summary adjudication. *See* Wright & Miller, § 2737 at 322–24. The obligation imposed on the court by Rule 56(d) to specify the uncontroverted material facts is technically compulsory. *See Woods v. Mertes*, 9 F.R.D. 318, 320 (D.Del.1949). However, if the court determines that identifying indisputable facts through partial summary adjudication would not materially expedite the adjudicative process, it may decline to do so. *See* Wright & Miller, § 2737 at 318–19.

### C. *Pretrial Schedule*

▆▆▆▆ Rule 16(b) of the Federal Rules of Civil Procedure authorizes the district court to control and expedite pretrial discovery through a scheduling order. The standard for permitting modification of a scheduling conference order pursuant to Rule 16 is "good cause." Fed.R. Civ.P. 16(b) ("A schedule shall not be modified except upon a showing of good cause and by leave of the district judge . . . ."). Rule 16(b)'s "good cause" requirement, like that for Rule 56(f) relief, considers the diligence of the party seeking relief. The court may also modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed.R. Civ.P. 16 advisory committee's notes (1983 amendment); *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 469 (D.N.J.1990); *Amcast Indus. Corp. v. Detrex Corp.*, 132 F.R.D. 213, 217 (N.D.Ind.1990). Carelessness is not a basis for granting relief. *Cf. Engleson v. Burlington Northern R.R. Co.*, 972 F.2d 1038, 1043 (9th Cir.1992) (carelessness not a ground for relief under Rule 60(b)); *Martella v. Marine Cooks & Stewards Union*, 448 F.2d 729, 730 (9th Cir.1971) (same). "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992). If a party was not diligent, the inquiry should end. *See id.; Geiserman v. MacDonald*, 893 F.2d 787, 790–92 (5th Cir.1990) (upholding decision to exclude expert witnesses based on party's failure to designate experts until two weeks after the expiration of the discovery deadline because explanations for delay were "weak, at best"). The decision to modify a scheduling order is within the broad discretion of the district court. *Johnson*, 975 F.2d at 607 (quoting *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 369 (9th Cir.1985)); *Geiserman*, 893 F.2d at 790.

### III. *ANALYSIS*

### A. *BNSF's Motion for Summary Judgment*

BNSF moves for summary judgment on the ground that Vendo/Floway as CERC-

LA section 113 defendants are liable only for their fair-and-several shares of liability to FMC (the PRP–Plaintiff), and as such they cannot bring third-party claims for section 113 contribution. *See* Doc.195 at p. 1:7–20. BNSF argues Floway's state law claims for contribution, apportionment and declaratory relief must be dismissed because 1) liability under HSAA is co-extensive with liability under CERCLA, and since Floway's CERCLA section 113 claims against BNSF are barred, its HSAA claim is barred; 2) if Floway cannot recover under CERCLA the response costs it has agreed to pay FMC, it should not be allowed to recover those same costs under an alternate state law theory. *See* Doc.195 at pp. 1–2.

### 1. *Liability of CERCLA § 113(f) Defendants*

CERCLA provides for the liability of potentially responsible parties ("PRPs") for cleanup costs associated with contamination by hazardous substances. Title 42 U.S.C. section 9607 provides:

... Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 104(i) [42 U.S.C. § 9604(i) ].

42 U.S.C. § 9607.

When remediation of a contaminated site involves multiple parties, claims for contribution may arise.

Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) [42 U.S.C. § 9607(a) ], during or following any civil action under section 106 [42 U.S.C. § 9606] or under section 107(a). Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court

determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107. 42 U.S.C. § 9613(f).

Section 107(a) creates the right of contribution, the "contours and mechanics" of which are specified in section 113(f). *See The Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1301–02 (9th Cir.1997) (section 107 creates the claims of contribution, i.e., liability, among PRPs and section 113 qualifies the nature of the claim, i.e., how to apportion liability among PRPs). In *Pinal Creek*, the Ninth Circuit held that "under CERCLA, a PRP does not have a claim for the recovery of the totality of its cleanup costs against other PRPs, and a PRP cannot assert a claim against other PRPs for joint and several liability." *Pinal Creek*, 118 F.3d at 1306. Rather, "a PRP is limited to a contribution claim governed by the joint operation of §§ 107 and 113." *Id.*

In *City of Merced v. R.A. Fields*, 997 F.Supp. 1326 (E.D.Cal.1998), the City of Merced discovered its groundwater was contaminated with tetrachloroethylene ("PCE"). *See City of Merced*, 997 F.Supp. at 1329. The City sued Merced Laundry under CERCLA and state law. *See id.* The City as a PRP could maintain a CERCLA action only for contribution under section 113. *See id.* Merced Laundry filed third-party complaints for contribution under CERCLA and state law against several parties. *See id.* The court dismissed Merced Laundry's claims for contribution against the third parties as to amounts the City spent responding to site contamination. *See City of Merced*, 997 F.Supp. at 1332. Merced Laundry as a contribution defendant was liable for no more than its fair-and-several share of liability to the City under section 113, it could not maintain its own contribution actions against third parties. *See id.*

*City of Merced* illustrates its holding with examples. Example 3 provides:

To forestall a suit by the Government, PRP X voluntarily begins cleanup of Site and incurs costs greater than X's equitable share. X, being a PRP, brings a contribution action against Y and Z. Y and Z, being contribution defendants, are not liable to X for more than their fair-and-several share of the cleanup costs. Y and Z therefore cannot bring contribution actions against A, B, or C. However, because X is a contribution plaintiff, and not a contribution defendant, X can.

*City of Merced*, 997 F.Supp. at 1333. This example is overbroad. It analyzes X's right to recover contribution against PRPs. Although Y and Z may not bring contribution actions against A, B, or C for X's cleanup costs, Y and Z may bring third-party contribution actions against A, B, or C for Y and Z's cleanup costs that were caused by A, B, and C. The example derives from a statement in *City of Merced* at page 1332: "Therefore, as a matter of logic, contribution defendants, as well as the parties brought in by the contribution defendants, who can by definition owe to contribution plaintiffs no more than their fair-and-several share of cleanup liability, cannot themselves maintain contribution actions of their own." *City of Merced*, 997 F.Supp. at 1332. This "logic" ignores the PRP contribution defendant who not only is liable to a contribution plaintiff for cleanup costs incurred by that plaintiff and caused by the contribution defendant, but who also itself incurs cleanup costs as a result of contamination caused by another PRP or PRPs over and above the several share of liability owed to the original contribution plaintiff.

The overbreadth of the purported rule that "contribution defendants, as well as parties brought in by contribution defendants, cannot maintain contribution actions of their own," is demonstrated by the result in *City of Merced*, where Merced Laundry was nonetheless permitted to sue other parties for contribution for costs in excess of Merced Laundry's equitable share for which other PRPs were alleged to be responsible. The necessary, but unstated qualification to the "rule" of *City of Merced* is that "contribution defendants, or those joined by them, are only barred from asserting a contribution action for the costs incurred by any other PRP, when those costs are not incurred by such contribution defendant." The statement has no application to non CERCLA based state law claims.

The implication at page 1332 of *City of Merced* that a contribution action is maintained solely under CERCLA § 113 is squarely rejected by *Pinal Creek*, 118 F.3d at 1305 n. 7 ("We also note that the Pinal Group's argument is based on the incorrect premise that a contribution action is not brought under § 107 .... As we have concluded above, a PRP's contribution action finds implicit recognition in § 107; § 113 merely regulates its implementation."). An interpretation barring contribution actions thwarts CERCLA's intended equitable allocation among all responsible PRPs.

BNSF argues that FMC is in the position of "X" in Example 3; Vendo/VMC and Floway are "Y" and "Z"; and BNSF is "A" (or "B" or "C"). *See* Doc.195 at p. 8. FMC sues Vendo/Floway for contribution under CERCLA section 113. *See* FAC at ¶¶ 1, 170. FMC has not sued BNSF. BNSF argues that since Vendo/Floway are liable to FMC only for their fair-and-several portion of liability, they, as "contribution defendants" like "Y" and "Z" in Ex-

ample 3, may not bring a contribution claim of their own. *See* Doc.195 at p. 8.

Vendo/Floway argue that because they were potentially jointly and severally liable to FMC for response costs relating to chromium and TCE contamination, they cannot be considered "contribution defendants" in the same position as "Y" and "Z". *See* Doc.212 at p. 6. *Pinal Creek* notes the Seventh Circuit exception to the general rule that a PRP is limited to a contribution action for "PRPs who have not polluted the site in any way." *See Pinal Creek*, 118 F.3d at 1303 n. 5 (citing *Rumpke of Indiana, Inc. v. Cummins Engine Co.*, 107 F.3d 1235, 1241 (7th Cir.1997) ("landowners who allege that they did not pollute the site in any way may sue for their direct response costs under § 107(a)")). The Ninth Circuit explicitly declined to address the issue of whether it recognizes such an exception. *See Pinal Creek*, 118 F.3d at 1303 n. 5.

Vendo/Floway argue FMC falls within the *Rumpke* exception with respect to TCE and chromium, *see* Doc.212 at p. 6, because FMC seeks § 107(a) contribution for 100% of its response costs to clean up TCE and chromium for which it claims no responsibility. *See* Doc.212 at p. 7:11–24. The *Rumpke* exception allows a PRP to maintain a direct cost recovery section 107(a) action only if a landowner alleges it "did not pollute the site *in any way*." *Rumpke*, 107 F.3d at 1241 (emphasis added). FMC has entered into a settlement under which it agrees to share cleanup costs of contaminants (excluding nitrates), including TCE and chromium. FMC has not alleged it did not pollute the site in any way. Unlike the purported innocent landowner in *Rumpke*, the government has ordered FMC to perform remediation at the Railroad Corridor Site, and other PRPs have brought cost recovery actions against FMC. *See, e.g., Zacky Farms, v.*

*FMC Corp. et al.,* CIV F 01–5380 OWW DLB.

■ *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761 (7th Cir.1994), the case from which the *Rumpke* exception was derived, suggests that if the harm to a contaminated site is divisible, a non-innocent PRP may be able to bring a direct cost recovery claim under section 107(a) under certain circumstances. *See Akzo,* 30 F.3d at 765. Separate and distinct subterranean plumes of groundwater contamination provide a basis to divide CERCLA liability for a site. *See United States v. Broderick Investment Co.,* 862 F.Supp. 272, 277 (D.Colo.1994). Here, Vendo/Floway allege the contamination from BNSF "potentially has commingled with the plume of pesticide contamination in groundwater beneath and downgradient of the FMC site." Doc.37 at ¶ 64; Doc.38 at ¶ 26 ("Third–Party Complainant . . . alleges . . . releases and disposal of wastes [by Third–Party Defendants] containing TCE and/or chromium and other hazardous substances have migrated/may continue to migrate through groundwater to locations where such substances have commingled with the plume of pesticide and other contamination in groundwater beneath and downgradient of the FMC Site"). A "single harm" may be divisible if it is possible to discern the degree to which different parties contribute to the damage. *See Broderick Investment,* 862 F.Supp. at 277. Single harms may be "treated as divisible in terms of degree," based on the relative quantities of waste discharged. *Matter of Bell Petroleum,* 3 F.3d 889, 895–96 (5th Cir.1993); *Hercules,* 247 F.3d at 718. This sort of divisibility may be provable even where wastes have become cross-contaminated and commingled, for "comingling is not synonymous with indivisible harm." *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 722 (2nd Cir.1993) ("*Alcan II* "); *see also Bell,* 3 F.3d at 903. Proving divisibility is a "very difficult proposition,"

*Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 934 n. 4 (8th Cir.1995), and the Restatement cautions against making an "arbitrary apportionment for its own sake." Restatement (Second) of Torts § 433A cmt. to subsection (2) (1965), *quoted in Bell,* 3 F.3d at 896.; *see also United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1535 (10th Cir.1995) (noting that "the courts have been reluctant to apportion costs").

■ Whether or not FMC's TCE and chromium claims may be somehow divisible from its own responsibility for contamination of the Railroad Corridor Site, FMC's election as a PRP to sue under CERCLA section 113 for contribution prevents FMC's suit against Vendo/Floway from being for direct cost recovery under section 107(a). *See* FAC at ¶¶ 1, 170. Vendo/Floway's contribution action is entirely permissible under *Pinal Creek,* if the recovery sought against other PRPs is not for response costs incurred by FMC. Whether FMC could have sued for direct cost recovery under section 107(a) is not relevant. The fact FMC sues under sections 107 and 113 for contribution means that Vendo/Floway are liable only for their fair-and-several shares of site liability. Even if Vendo/Floway settled for an amount they believe is more than their fair share, FMC's action is not a direct cost-recovery action under CERCLA § 107(a) as to Vendo/Floway. *See* Doc.212 at p. 8.

Vendo/Floway correctly argue that applying the holding of *City of Merced* to this case in the manner suggested by BNSF thwarts CERCLA's underlying policy objectives. *See* Doc.212 at p. 9. Prohibiting Vendo/Floway from maintaining contribution claims for FMC's response costs discourages settlement between FMC and Vendo/Floway and derogates CERCLA's policies of encouraging settlement and promoting prompt and effective cleanup of

contaminated sites. *See id. Pinal Creek* rejects the argument that limiting PRPs to contribution claims undermines CERCLA's policy of promoting rapid and voluntary environmental responses to hazardous waste threats. *See Pinal Creek,* 118 F.3d at 1304 ("We reject this argument because it is based on policy considerations which we cannot consider in light of controlling text, structure, and logic of CERCLA and of our own precedent in [*In re*] *Dant & Russell," Inc.,* 951 F.2d 246, 249 (9th Cir. 1991)). The court noted that rapid, voluntary responses by private parties may be taken into account under section 113(f) when equitably apportioning liability and that other economic incentives exist for private parties to initiate cleanup prior to government intervention. *See Pinal Creek,* 118 F.3d at 1304–05. Allowing a PRP such as FMC to hold other PRPs jointly and severally liable for their response costs would effectively immunize the plaintiff PRP from liability for orphan shares (those shares attributable to PRPs who are either insolvent or unavailable). *See Pinal Creek,* 118 F.3d at 1303. Such a rule reduces a plaintiff PRP's incentive to sue all PRPs and "would undermine the ability of courts to allocate costs between all PRPs 'using such equitable factors as the court determines are appropriate.'" *Id.* (quoting 42 U.S.C. § 9613(f)(1)).

There is no evidence FMC has acted in collusion with BNSF to maximize Vendo/Floway's liability. To the contrary, according to the Deal Point Memorandum containing the essential terms of the settlement between FMC and Vendo/Floway, FMC agrees not to assist BNSF in its prosecution or defense of the claims between BNSF and Vendo/Floway, "such as by providing BNSF with FMC's attorney work product, expert work product or by waiving any conflict between BNSF and an FMC expert." Doc.197, Exh. D. There is no evidence of fraud or coercion in the settlement or FMC's decision not to sue

BNSF. Although FMC had an incentive to sue BNSF if BNSF contributed to the contamination FMC was remediating, as Vendo/Floway note, "FMC refused to acknowledge BNSF's [alleged] contribution to the chromium contamination." Doc.212.

Any policy considerations which favor allowing Vendo/Floway to recover in contribution against BNSF for FMC's response costs are outweighed by the objectives of avoiding multiple, unnecessary lawsuits, maintaining incentives for PRP plaintiffs to sue as many PRPs as possible (thereby avoiding substantial liability for remaining shares), and the overall concern with the speedy and effective cleanup of contaminated sites. *See THAN,* 884 F.Supp. at 361 ("All that the *Kramer* opinion actually accomplishes is another round of litigation—as defendant PRPs counterclaim against the plaintiff PRP to effectuate their recovery. Such an approach guarantees inefficiency, potential duplication, and prolongation of the litigation process in a CERCLA case.") (citing *United States v. Kramer,* 757 F.Supp. 397, 416–17 (D.N.J.1991)).

To the extent Vendo/Floway make claims for contribution for its liability to FMC for FMC's response costs, those claims are barred. Because Vendo/Floway are liable to FMC only for their fair-and-several shares of liability, they may not maintain an action under CERCLA for contribution to recover for liability they incur for FMC's response costs, even if above their fair shares. BNSF's motion for summary judgment as to Vendo/Floway's claims for contribution under CERCLA as to FMC's response costs is GRANTED.

### 2. *Viability of Contribution Claims by § 113(f) Defendants for "First Instance" Costs*

Vendo/Floway are not necessarily precluded from maintaining §§ 107 and 113

contribution claims against BNSF or other PRPs because of their status as contribution defendants, for response costs they incurred and they allege were caused by other PRPs. Despite its contrary language, *City of Merced* recognizes that contribution defendants who incur costs in response to state or federal administrative agency directives are potentially jointly and severally liable for those costs. *See City of Merced*, 997 F.Supp. at 1333. In *City of Merced*, Merced Laundry was permitted to maintain an action for costs it incurred responding to an Environmental Protection Agency directive to clean up the site, *see id.*, and a contribution action to recover such so-called "administrative response" costs. *See id.* Vendo/Floway argue they seek and are entitled to the "first instance" costs[5] they have incurred relating to characterizing the TCE and chromium contamination, installing and reporting results from off-property monitoring wells, investigating BNSF's property, and evaluating the use of Zacky Farms' property to establish hydraulic control over the contamination plume. *See* Doc.212 at p. 10. BNSF argues Vendo/Floway are precluded from recovering first instance costs because Vendo/Floway do not assert such a claim in their third-party complaints and Rule 14(a) requires dismissal of third-party claims not derivatively based on a plaintiff's original claim. *See* Doc.217 at pp. 8–9.

### a. *Third–Party Complaints*

In their third-party complaint against BNSF and other third-party defendants, Vendo and VMC allege in their first claim,

"To the extent that Complainants are found liable in any action or administrative proceeding for any past, present or future response costs, damages, or other fees and expenses arising from the release or disposal of hazardous substances ... onto or under the Vendo/Floway Site, the FMC site, or such other location of migration of such alleged hazardous substances, then Complainants are entitled to contributions from [third-party defendants], based upon equitable factors as the court determines are appropriate pursuant to CERCLA § 113(f) (42 U.S.C. § 9613(f))." Doc.37 at ¶ 77. Vendo and VMC seek "contribution for the equitable allocation of [third-party defendants] to any past, present, or future response costs, damages or other expenses incurred by, or assessed against, Complainants as a result of the release or disposal of hazardous substances ... onto or under the Vendo/Floway Site, the Calwa Ice House Site, the Valley Foundry Site and the CMS Site." *See id.* at ¶ 85. In their second claim, Vendo and VMC allege third-party defendants "are liable for some or all response costs, damages or other fees and expenses incurred by Complainants, if any, and that [third-party defendants] are obligated to reimburse Complainants for such response costs, damages, or other fees and expenses." *See id.* at ¶ 80. Vendo and VMC seek a judicial determination of the relative liability of Vendo/VMC and third-party defendants under CERCLA section 113(g)(2). *See id.* at ¶¶ 79, 83, 86. Floway's third-party complaint's first two claims are nearly identical. *See* Doc.38 at ¶¶ 28–39, p. 11.

---

**5.** The decision in *Pinal Creek* defines "first instance costs" as costs incurred by a "working PRP," a PRP that actually conducts cleanup operations, as opposed to one that reimburses a third party for the cost of the latter's cleanup efforts. *See Pinal Creek*, 118 F.3d at 1304 n. 6. The decision in *City of Merced* defines "administrative response costs" as costs incurred by a party ordered to respond to a hazardous waste site by a state or federal administrative agency. *See City of Merced*, 997 F.Supp. at 1333. First instance costs include administrative response costs and other costs of cleanup operations directly incurred.

■ While Vendo, VMC, and Floway's first claim against BNSF seeks reimbursement for liability it may incur for FMC's response costs, it explicitly seeks contribution for "any past, present, or future response costs, damages or other expenses incurred by" Vendo, VMC, and Floway. *See* Doc.37 at ¶ 85; Doc.38 at p. 11:4–7. Vendo/Floway also explicitly seek in their second claim a judicial determination of the relative liability of Vendo/Floway and BNSF under CERCLA section 113(g)(2). *See* Doc.37 at ¶¶ 79, 83, 86; Doc.38 at ¶¶ 35, 36, 39, p. 11:8–12. These claims include claims for first instance costs separate and apart from FMC's response costs. The fact that Vendo/Floway did not mention the 1999 ISE Order or the term "first instance costs" in their third-party complaint does not prevent these allegations from being sufficient to give notice that contribution is sought for such costs. *Cf.* Doc.217 at p. 7:11–16. The motion for summary judgment is denied as to first instance costs, including ISE compliance costs, caused by BNSF or other PRPs

b. *Rule 14(a)*

BNSF argues Vendo/Floway's claims for first instance costs are independent and unrelated to the FMC action and settlement and must be dismissed pursuant to Fed.R. Civ.P. 14(a). Rule 14(a) provides, in relevant part:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff.

Fed.R. Civ.P. 14(a).

Vendo/Floway are entitled to bring third-party claims against BNSF if BNSF "is or may be liable to [FMC] for all or part of the [FMC's] claim against [Ven-do/Floway]." Fed.R. Civ.P. 14(a). A "third-party claim may be asserted only when the third party's liability is in some way dependent on the outcome of the main claim and the third party's liability is secondary or derivative." *United States v. One 1977 Mercedes Benz,* 708 F.2d 444, 452 (9th Cir.1983) (affirming a trial court's dismissal of defendant's third-party complaint against federal agents for violation of defendant's constitutional rights in a forfeiture action by the United States).

Even if BNSF may not be liable to Vendo/Floway for FMC's claims under CERCLA section 113 relating to FMC's response costs, BNSF can be liable to Vendo/Floway for FMC's RCRA and state law claims for which Vendo/Floway may be held jointly and severally liable, if BNSF was the cause. *See* FAC (seeking injunctive relief under section 7002(a)(1)(B) of the RCRA, and indemnity, contribution, declaratory relief, and damages under California law). The bar against contribution defendants' claims for contribution for a contribution complainant's response costs does not apply to FMC's non-CERCLA claims. Vendo/Floway may maintain state law claims against BNSF for contribution to recover the costs FMC seeks under state law, which were caused by BNSF. Only Floway asserts a claim under state law for contribution. *See* Doc.38. BNSF is potentially liable under Floway's state law declaratory relief contribution and indemnity claim for at least some of the costs FMC seeks against Floway, Floway's state law declaratory relief claim is properly brought under Rule 14(a). Some of Floway's state law declaratory relief claim is, at least in part, derivative of FMC's state law claims for continuing nuisance and trespass against Floway. *See* Doc.217 at p. 9:7–8. By BNSF's alleged releases from its real property which contributed to a single plume, the claims are inextricably intertwined. To its state law claim

brought in compliance with Rule 14(a), Floway may join "as many claims, legal, equitable, or maritime, as the party has against" BNSF. Fed.R. Civ.P. 18(a); *see also Banks v. City of Emeryville,* 109 F.R.D. 535, 540 (N.D.Cal.1985) (third-party claim may be based on a different theory of liability than the main action).

■ Vendo/VMC assert only CERCLA claims. *See* Doc.37. The distinction between FMC's response costs and Vendo/Floway's first instance costs, which determines the viability of Vendo/Floway's CERCLA 113 claims, does not disqualify the claims under Rule 14(a). That Vendo/Floway's claims for first instance costs are "independent," in a CERCLA section 113 sense, from their claims related to FMC's costs, does not mean they are "independent" and therefore not derivative of FMC's claims in a Rule 14(a) sense. In *Kemper Prime Indus. Partners v. Montgomery Watson Amer., Inc.,* 2000 U.S. Dist. Lexis 11450, 2000 WL 876222 (N.D.Ill.2000), plaintiff Kemper sued Montgomery Watson Americas ("MWA"), alleging negligent misrepresentation in an environmental assessment of industrial property MWA performed for Kemper. *See Kemper,* 2000 U.S. Dist. LEXIS 11450 at *2, 2000 WL 876222 at *1. MWA impleaded third-party defendant Prime Group, alleging, *inter alia,* CERCLA claims. *See id.* at *6, 2000 WL 876222 at *2-3. In denying Prime Group's motion to dismiss on the grounds it was improperly impleaded under Rule 14(a), the court stated that "MWA set forth a number of facts in its complaint, which allege that the Prime Entities' own negligence, in not immediately cleaning up the property and in performing improper trenching operations, exacerbated the contamination at the Site. On this basis, secondary liability could be established." *Id.* at *11-12, 2000 WL 876222at *4. Impleader may be appropriate where a third-party defendant is potentially liable to the third-party plaintiff

for damages to the extent necessary to put the third-party plaintiff in the position he would have been in absent the alleged wrongdoing by the third-party defendant. *See id.* at *11, 2000 WL 876222 at *4 (citing *Leaseway v. Carlton,* 568 F.Supp. 1041 (N.D.Ill.1983)).

"The decision to allow a third-party defendant to be impleaded under rule 14 is entrusted to the sound discretion of the trial court." *Mercedes Benz,* 708 F.2d at 452. "Rule 14(a) was designed to permit the liberal joinder of parties so that judicial energy could be conserved and consistency of results guaranteed." *New York v. Solvent Chem. Co.,* 179 F.R.D. 90, 93 (W.D.N.Y.1998) (citations omitted); *Lehman v. Revolution Portfolio L.L.C.,* 166 F.3d 389, 393 (1st Cir.1999) ("whether a third-party defendant may be impleaded under Rule 14 continues to be a question addressed to the sound discretion of the trial court") (citation omitted). Joinder under Rule 14(a) should be "freely granted to promote ... efficiency unless to do so would prejudice the plaintiff, unduly complicate the trial, or would foster an obviously unmeritorious claim." *Solvent Chem.,* 179 F.R.D. at 93 (citation omitted). Plaintiff FMC is no longer a party. It is not prejudiced by the presence of BNSF in the case. Rule 14(a) does not require dismissal of a third-party complaint where discovery is not complete. Joint-trial is favored by "the efficiency of considering all claims involving the subject site in a single lawsuit, and the moving party would not suffer any prejudice in its ability to defend against the claim in the present action that it would not also suffer as a defendant in a separate action." *Solvent Chem.,* 179 F.R.D. at 93-94. Permitting Vendo/Floway's third-party complaint to go forward will not cause undue delay since the claims between Vendo/Floway and BNSF are the only claims remaining in the action. None of the reasons why Rule 14(a) prohibits

joinder of non-derivative claims is present here. Requiring a duplicitous separate lawsuit to address inextricably related claims over contiguous CERCLA sites, would unnecessarily multiply the litigation and waste judicial and party resources.

Vendo/Floway allege BNSF is a joint tortfeasor responsible for the TCE and chromium contamination which forms the basis of FMC's claims against Vendo/Floway. While FMC's failure to name BNSF as a defendant may have certain consequences under CERCLA, those consequences do not prevent Rule 14(a), impleaded of BNSF on the theory that BNSF is liable for at least some of the TCE and chromium contamination for which Vendo/Floway have incurred costs. As a practical matter, the claims of FMC and Vendo/Floway in this action, and BNSF's claims in the related action, *Burlington Northern v. Vendo,* CIV F 01–6434 OWW LJO, are so interrelated that the interests of justice and efficiency favor consolidation of the claims into a single action. The *BNSF* case arose out of contamination and the need for CERCLA remediation of related sites in the Railroad Corridor. In a separate decision, the BNSF claims have been consolidated with the *FMC* action. BNSF's claims are compulsory counterclaims to Vendo/Floway's third-party claims asserted against BNSF in the *FMC* case. These compulsory counterclaims have been consolidated with the *FMC* action. The limitations in Rule 14(a) regarding what claims may be asserted against third-party defendants are designed to promote judicial efficiency by resolving independent disputes in a single lawsuit. The decision on Vendo/Floway's motion to dismiss, stay, or consolidate in the *BNSF* action held that "the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Hydranautics,* 70 F.3d at 536 (citations omitted).

These same factors prevent dismissal of Vendo/Floway's claims against BNSF based on Rule 14(a). *See* Doc.146 (order denying BNSF's severance motion on the grounds of fairness and judicial economy).

Vendo/Floway's third-party complaint for contribution from BNSF under CERCLA sections 107 and 113(f) for first instance costs, which BNSF caused to be incurred, are properly asserted. BNSF's motion for summary judgment as to Vendo/Floway's CERCLA claims for contribution for first instance response costs is DENIED.

### 3. *Floway's HSAA Claims*

BNSF argues Floway's HSAA claims are barred because liability under the HSAA is coextensive with liability under CERCLA, and BNSF cannot be liable to Floway under CERCLA. *See* Doc.195. Floway argues that, while the HSAA incorporates CERCLA's description of responsible parties and available defenses, HSAA does not incorporate the entire body of federal common law CERCLA jurisprudence including any interpretation of *City of Merced* that bars contribution defendants from asserting their own contribution claims under HSAA against other PRPs. *See* Doc.212 at p. 12:1–12.

In *THAN,* 884 F.Supp. at 363, this court stated: "Liability under CHSAA requires a finding of liability under CERCLA." *THAN,* 884 F.Supp. at 363 (citing Cal. Health & Safety Code § 25323.5(a)). Floway's HSAA contribution claim against BNSF (and FMC's HSAA contribution claim against Vendo/Floway) is asserted under Cal. Health & Safety Code section 25363. *See* Doc.38; FAC. Section 25363 provides, in relevant part:

> . ... any party found liable for any costs or expenditures recoverable under this chapter who establishes by a preponderance of the evidence that only a

portion of those costs or expenditures are attributable to that party's actions, shall be required to pay only for that portion.

Cal. Health & Safety Code § 25363(a).

Section 25363(e) provides, in relevant part:

Any person who has incurred removal or remedial action costs in accordance with this chapter or the federal act may seek contribution or indemnity from any person who is liable pursuant to this chapter.... An action to enforce a claim may be brought as a cross-complaint by any defendant in an action brought pursuant to Section 25360 or this section, or in a separate action after the person seeking contribution or indemnity has paid removal or remedial action costs in accordance with this chapter or the federal act.... In resolving claims for contribution or indemnity, the court may allocate costs among liable parties using those equitable factors which are appropriate.

Cal. Health & Safety Code § 25363(e).

■ Section 25363(e) expressly authorizes a contribution cross complaint in a pending HSAA suit, or separate lawsuit for contribution after payment of costs for removal or remedial actions under either HSAA or CERCLA. Contribution defendants may sue other PRPs, including a contribution plaintiff for first instance costs. Section 25363(a) recognizes the same principal of several liability for response costs under the HSAA; contribution defendants are not liable for more than each party's fair-and-several share of response costs, despite the exposure of a PRP to joint and several liability as a CERCLA 107 direct cost recovery defendant. However, just as Vendo/Floway's CERCLA claims for its own first instance response costs are properly asserted under CERCLA, Floway's claim for first instance costs under HSAA may be asserted

against BNSF under § 25363(e) and any other PRPs who may be liable under the HSAA. The state law follows the federal. BNSF's motion for summary judgment as to Floway's claim for contribution under HSAA as to FMC's response costs for which Floway has not expended costs is GRANTED. BNSF's motion for summary judgment as to Floway's HSAA claim for contribution for Floway's own first instance response costs is DENIED.

### 4. Floway's State Law Declaratory Relief Claim

BNSF argues Floway's state law claim for declaratory relief should be dismissed because 1) Floway should not be able to obtain contribution under a state law theory if such a claim is barred under a federal law CERCLA theory; and 2) the court should decline to exercise supplemental jurisdiction over remaining state law claims in the absence of any viable federal claims. See Doc.195 at pp. 12:10–p.15:2.

■ Floway correctly notes that BNSF's first argument was explicitly rejected in the decision in *City of Merced*, which held "that while liability for the CERCLA claims is several, liability of all parties to the [PRP plaintiff] under state-law theories is joint and several.... CERCLA does not preempt state-law causes of action that concern cleanup of hazardous materials." *City of Merced*, 997 F.Supp. at 1336 (citing 42 U.S.C. § 9652(d)). BNSF argues *City of Merced* does not apply on this point because here FMC, unlike the PRP City of Merced, is no longer a party due to its settlement with Vendo/Floway. See Doc.217 at p. 10:17–25. BNSF argues that here "Floway asks this Court to rule upon FMC's now-theoretical continuing nuisance and continuing trespass damages and then declare BNSF liable for some of those theoretical damages." *Id.* FMC's claims against Ven-

do/Floway for continuing nuisance and trespass are asserted in its FAC; they are not "theoretical" simply because FMC and Vendo/Floway settled. Any injury to real property of a claimant from the release and entry of contaminants past, present, and future may be addressed under these state legal theories. Any complexity that may arise in apportioning liability due to the FMC settlement agreement's lack of specificity as to how liability is apportioned under the settlement, has no effect on the basic principle that CERCLA does not preempt state law claims related to environmental cleanup.

As to BSNF's supplemental jurisdiction argument, Floway retains viable CERCLA contribution claims relating to its first instance costs; the exercise of supplemental jurisdiction over the state law claims is required under 28 U.S.C. § 1367. BNSF's motion for summary judgment as to Floway's state law claim for declaratory relief is DENIED.

**B.** *Vendo/Floway's Motion to Quash BNSF's Proposed Subpoenas of Plaintiff FMC's Experts*

**1.** *Vendo/Floway's Position*

Vendo/Floway argue BNSF should be prohibited from deposing and calling as witnesses at trial, experts retained and designated by FMC before FMC and Vendo/Floway agreed to dismiss the claims against each other in settlement of their dispute. *See* Docs.199, 201; Doc.199, Exh. A (the "Settlement"). The Settlement provides that FMC shall not make expert work product available to BNSF, and FMC has agreed in conjunction with the Settlement to withdraw its expert designations in this case. *See* Doc.199, Exh. A at ¶ 15; Doc.199, Elliott Decl. at ¶ 3. Vendo/Floway argue BNSF chose to designate only two experts in this case even though they had ample opportunity over a nine-month period to retain and prepare what-

ever experts they needed. *See* Doc.219 at p. 2:1–3. Vendo/Floway maintain BNSF took a calculated risk by relying on FMC's experts' availability at trial without obtaining an agreement from FMC to cross-designate and share the cost of the experts. *See* Doc.199 at p. 2. Vendo/Floway argue BNSF cannot demonstrate the extraordinary circumstances required under Fed.R. Civ.P. 26(b)(4)(B) to justify an order allowing it to utilize FMC's experts' work in contravention of the Settlement and at the expense of delaying trial in this case. *See* Doc.199 at p. 2:24.

Vendo/Floway contend the parties entered into no written stipulation pursuant to Rule 29 regarding the taking of depositions. *See* Doc.187 at p. 5:1–9. BNSF chose not to participate in the ultimate settlement between FMC, Vendo, VMC, and Floway. Vendo/Floway speculate "BNSF expected that the settling parties' momentum and desire to resolve all claims would enable BNSF to settle at a bargain price. BNSF's 'lowball' strategy failed and did not reach a settlement." Doc.187 at p. 6:7–10. Vendo/Floway argue BNSF created the situation in which it finds itself. *See id.* at p. 6:11–18.

> ... BNSF has been a party in this case for fifteen months. During this time, while FMC designated eleven experts, Vendo and Floway jointly designated nine experts, and Floway designated four additional experts, BNSF took a calculated risk and designated only two experts, perhaps hoping to ride FMC's coattails against Vendo and Floway. Having refused to settle on fair terms with the other parties, BNSF now seeks to roll back the clock and start fresh with a six to seven month delay and a new roster of experts.

*Id.*

Floway contends BNSF should have jointly designated experts with FMC as is customarily done in such cases. Floway's

Opp. at p. 3. Floway maintains that in the absence of any agreement with FMC, BNSF has no right to "parasitically" benefit from FMC's efforts. *See id.* Floway observes BNSF has not made any affirmative claims in this litigation, so it needs only to prepare for its defense. *See id.* at p. 4. This is overly simplistic because the origin and paths of contaminant releases cannot be analyzed without expert testimony and the causes of and need for remediation consistent with the NCP must be established.

### 2. *BNSF's Position*

BNSF contends Rule 26(b)(4)(B), the "extraordinary circumstances" test, does not apply here since FMC has already designated their experts and the experts have exchanged reports and opinions. *See* Doc.204 at p. 1:13–22. BNSF argues it lies within the sound discretion of the court to permit BNSF to depose FMC's experts based on a balancing of the probative value of the testimony and the prejudice to the other party under Fed.R. Evid. 403. *See id.* According to BNSF, the probative value of the experts' testimony is high, while Vendo/Floway will suffer minimal prejudice because they have already prepared to defend against FMC's experts and they are not the party whose experts BNSF seeks to depose. *See id.* at p. 2. BNSF maintains it will be severely prejudiced if it is not allowed to use FMC's experts. *See id.* BNSF contends the Set-

tlement itself contains no provision requiring FMC to withdraw its experts or make them unavailable for BNSF to use, so the Settlement Agreement would not be breached by allowing BNSF to depose or subpoena for trial FMC's experts. *See* Doc.204 at p. 2:3–9. BNSF argues it did not have sufficient time, given the voluminous and complex nature of the material at issue and the late date at which it entered the litigation, to designate and prepare on its own all of the experts it needs for this case. *See* Doc.204 at p. 3. BNSF maintains it justifiably relied on being able to use FMC's experts at trial. *See id.* at p. 5. BNSF contends it had no reason to believe FMC would settle out of the case before February 8, 2002. *See id.* FMC at oral argument stated it continues to work with its experts and does not wish for them to provide work product or services for BNSF.

### 3. *Appropriate Standard*

Vendo/Floway argue Fed.R. Civ.P. 26(b)(4)(B), regarding discovery of non-testifying expert witnesses, applies to this situation. *See* Doc.199 at p. 3. Rule 26(b)(4)(B) provides that:

A party may ... discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(b)[6] or

---

[6]. Fed.R. Civ.P. 35(b) governs expert reports of physical and mental examinations of parties or persons under the legal control of a party.

(1) If requested by the party against whom an order is made under Rule 35(a) or the person examined, the party causing the examination to be made shall deliver to the requesting party a copy of the detailed written report of the examiner setting out the examiner's findings, including results of all tests made, diagnoses and conclusions, together with like reports of all earlier exami-

nations of the same condition. After delivery the party causing the examination shall be entitled upon request to receive from the party against whom the order is made a like report of any examination, previously or thereafter made, of the same condition, unless, in the case of a report of examination of a person not a party, the party shows that the party is unable to obtain it. The court on motion may make an order against a party requiring delivery of a report on such terms as are just, and if an examiner fails or refuses to make a report the court

upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Fed.R. Civ.P. 26(b)(4)(B). Under the Rule 26(b)(4)(B) standard, BNSF must make a showing that "extraordinary circumstances" exist which justify its deposing FMC's experts.

BNSF argues experts whose identities and opinions have been disclosed pursuant to Rule 26(a)(2) may be deposed or subpoenaed for trial by an opposing party within the sound discretion of the court. *See* Doc.204 at p. 1. In deciding whether to allow such a deposition or subpoena, the probative value of the testimony is weighed against the prejudice to the opposing party under Fed.R. Evid. 403. *See id.* For convenience, this standard is referred to as the "balancing standard."

Fed.R. Civ.P. 26(a)(2)(A) requires a party to disclose to other parties the identity of any person who may testify as an expert witness at trial. *See* Fed.R. Civ.P. 26(a)(2)(A). Fed.R. Civ.P. 26(b)(4)(A) provides: "A party may depose any person who has been identified as an expert whose opinions may be presented at trial." Fed.R. Civ.P. 26(b)(4)(A).

BNSF argues the analysis in *House v. Combined Ins. Co. of Amer.,* 168 F.R.D. 236 (N.D.Iowa 1996), applies. *See* Doc.204 at p. 5. *House* addressed "the vexing and surprisingly little explored question of whether one party should be able to depose or call at trial an expert designated by an opposing party who was expected to be called at trial, but whom the designating party has announced it will not call at trial." *House,* 168 F.R.D. at 238. In *House,* plaintiff sued for employment discrimination based on quid pro quo sexual harassment, seeking, *inter alia,* damages for emotional distress. *See id.* Defendant employer designated a psychologist, Dr. Taylor, as an expert to rebut testimony of plaintiff's expert (a social worker, not a psychologist) regarding plaintiff's emotional suffering. *See id.* After Dr. Taylor examined plaintiff and prepared a report, plaintiff noticed Dr. Taylor's deposition and moved to compel production of his report. *See id.* Defendant moved to quash Dr. Taylor's deposition and for a protective order precluding any discovery from Dr. Taylor on the ground that defendant had decided not to call Dr. Taylor as a witness at trial. *See id.* Although defendant had not formally withdrawn its designation of him as an expert, Dr. Taylor was included in defendant's witness list in the final pretrial order. *See id.* The magistrate judge assigned to the case ruled that plaintiff was entitled to Dr. Taylor's report pursuant to Fed.R. Civ.P. 35(b) but not entitled to depose Dr. Taylor because no exceptional circumstances pursuant to Fed.R. Civ.P. 26(b)(4)(B) had been shown. *See House,* 168 F.R.D. at 238–39. Defendant filed a motion *in limine* to bar Dr. Taylor's testimony at trial. *See House,* 168 F.R.D. at 239.

The court identified four interests weighing against allowing an opposing party to depose or call at trial a consultant, non-testifying expert witness: 1) desire to allow counsel to obtain necessary expert advice without fear that every expert consultation may yield grist for the adversary's mill; 2) unfairness of allowing an

---

may exclude the examiner's testimony if offered at trial.

. . .

(3) This subdivision applies to examinations made by agreement of the parties, unless the agreement expressly provides otherwise. This subdivision does not preclude discovery of a report of an examiner or the taking of a deposition of the examiner in accordance with the provisions of any other rule.

Fed.R. Civ.P. 35(b).

opposing party to reap benefits from another party's effort and expense; 3) fear of discouraging experts from serving as consultants if their testimony could be compelled; and 4) the substantial risk of prejudice stemming from the fact of the prior retention of an expert by an opposing party. *See House,* 168 F.R.D. at 241 (citations omitted).

*House* analyzed the "exceptional circumstances," "balancing," and "entitlement" standards. Under the latter standard, a party required to submit to an expert examination should be "entitled" to the examining expert's report and a deposition of the expert for use at trial. *See House,* 168 F.R.D. at 244. *House* distinguished between experts who will testify at trial pursuant to Fed.R. Civ.P. 26(b)(4)(A) from consultant experts who are not designated to testify at trial. *See House,* 168 F.R.D. at 245.

> ... Parties should be encouraged to consult experts to formulate their own cases, to discard those experts for any reason, and to place them beyond the reach of an opposing party, if they have never indicated an intention to use the expert at trial. Such a consulted-but-never-designated expert might properly be considered to fall under the work product doctrine that protects matters prepared in anticipation of litigation. For this reason also, the ability of an opposing party to call a never-designated expert at trial should depend upon a showing of "extraordinary circumstances."
>
> However, once an expert is designated, the expert is recognized as presenting part of the common body of discoverable, and generally admissible, information and testimony available to all parties. The practical effect of a Rule 26 designation of an expert is to make an expert available for deposition by the opposing party, and such a deposition preserves the testimony of the

expert, should the expert later become unavailable, or provides a basis for impeachment, should the expert's opinion offered at trial differ. Thus, Rule 26 designation waives the "free consultation" privilege a party enjoys as to its non-testifying experts. The court therefore concludes that designation of an expert as expected to be called at trial, pursuant to Fed.R. Civ.P. 26(b)(4)(A), even if that designation is subsequently withdrawn, takes the opposing party's demand to depose and use the expert at trial out of the "exceptional circumstances" category of Rule 26(b)(4)(B).

*House,* 168 F.R.D. at 245 (citations omitted).

The court also relied on the nature and circumstances of the expert testimony sought. *See House,* 168 F.R.D. at 246 ("designation, and submission to a medical examination by the designated expert, create the kind of reliance on the availability of the expert that the court in *Rubel* found lacking where an expert had been consulted, but never designated") (citation omitted). Although *House* noted that Rule 35 did not "entitle" a party to depose or use at trial another party's examining expert, the expert was a psychologist who had conducted a Rule 35 mental examination of the plaintiff and was subject to the trial testimony provisions of that Rule. *See House,* 168 F.R.D. at 246 ("What, then, is the proper standard for [plaintiff] House's access to and use at trial of Dr. Taylor, where both a Rule 26(b)(4)(A) designation has occurred, albeit a designation subsequently withdrawn, and a Rule 35 medical examination has occurred?").

The court found that the circumstances warranted the application of a discretionary "balancing" standard. *See House,* 168 F.R.D. at 246. Balancing favored deposition and use of the expert at trial based

on: 1) plaintiff's interest in presenting relevant, probative information to the jury, non-cumulative of plaintiff's social worker expert who would not present psychological expert testimony; 2) the court's interest in proper resolution of the issues; and 3) plaintiff's reasonable reliance on being able to use Dr. Taylor's testimony because she was asked to consent to examination only after Dr. Taylor was designated. *See House,* 168 F.R.D. at 247. The defendant had not taken the necessary steps to prepare its expert testimony before the designation deadline. *See House,* 168 F.R.D. at 248 ("The court finds little interest in relieving a party of the consequences of an expert designation made simply to meet a court-ordered deadline, when Rule 26 provides every protection for finding and using an expert to prepare for trial prior to designation of the expert as expected to testify at trial."). The potential for prejudice to defendant from revealing to the jury Dr. Taylor was originally hired by defendant could be reduced or eliminated by excluding evidence as to how Dr. Taylor became involved in the case. *See id.* Plaintiff was allowed to depose Dr. Taylor. *See id.; see also Agron v. Trustees of Columbia Univ.,* 176 F.R.D. 445 (S.D.N.Y. 1997) (finding Rule 26(b)(4)(B) inapplicable where plaintiff voluntarily permitted discovery of its expert's opinions and finding the balance favored allowing defendant to use plaintiff's withdrawn expert at trial).

Vendo/Floway contend *House* has no applicability to cases not involving Rule 35 personal medical or psychological examinations, involving expert reports discoverable under Rule 35(b). *See* Doc.219 at p. 2. Vendo/Floway observe that the *House* reasoning was rejected in *Lehan v. Ambassador Programs, Inc.,* 190 F.R.D. 670 (E.D.Wash.2000). *See* Doc.219 at p. 2. In *Lehan,* defendant informed the court it did not intend to call an expert, who had performed a Rule 35 examination and was listed on defendant's pretrial witness list.

*See Lehan,* 190 F.R.D. at 671. *Lehan* denied plaintiff use of defendant's expert, explicitly rejected the balancing standard adopted in *House,* and instead applied the exceptional circumstances standard. *See Lehan,* 190 F.R.D. at 672.

In *Ross v. Burlington N.R. Co.,* 136 F.R.D. 638 (N.D.Ill.1991), plaintiff designated his expert and revealed the subject matter of the expert's testimony. After plaintiff withdrew his designation, defendant sought to depose the expert. *See Ross,* 136 F.R.D. at 638. *Ross* found that the "plaintiff has the prerogative of changing his mind" regarding the designation of experts. *See Ross,* 136 F.R.D. at 639. "Since plaintiff changed his mind before any expert testimony was given in this case, the witness never actually acted as a testifying expert witness." *Id.* The *Ross* court was not confronted with "a situation where facts or opinions were disclosed" and applied the exceptional circumstances standard in denying defendant's request to depose plaintiff's de-designated expert. *Id.* (citing *Durflinger v. Artiles,* 727 F.2d 888, 891 (10th Cir.1984) (affirming trial court's exclusion of testimony of expert originally designated and subsequently withdrawn by plaintiff because defendants failed to show exceptional circumstances)).

In *Dayton–Phoenix Group, Inc. v. Gen. Motors Corp.,* 1997 WL 1764760 (S.D.Ohio 1997), defendant designated an expert to testify about equipment and machinery. After defendant decided not to call the expert as a witness, plaintiff sought to subpoena him. *See Dayton–Phoenix,* 1997 WL 1764760 at *1. *Dayton–Phoenix* considered the differing results in *House* and *Ross* and adopted *Ross's* exceptional circumstances approach. *See id.* The court reasoned: 1) the Advisory Committee Notes to Rule 26(b)(4)(B) limit discovery to "trial witnesses," the expert would not be a trial witness; 2) the primary purpose of Rule 26(b)(4)(B) is to allow a party to

prepare adequately for cross-examination at trial, a purpose not applicable where the witness would not actually be called at trial; and 3) Rule 26(b)(4)(B)'s purpose of promoting fairness by preventing access to another party's diligent trial preparation is furthered by denying such access. *See id.*

In *Wolt v. Sherwood*, 828 F.Supp. 1562, 1568 (D.Utah 1993), the court held that Rule 26(b)(4)(B) "is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation." The court in *Wolt* applied the exceptional circumstances standard in holding that non-settling defendants could not use experts retained by a settling defendant where the settlement agreement prevented such use. *See Wolt*, 828 F.Supp. at 1567–68 ("Nonsettling parties are not prejudiced because the 'expertise' will be made available, in spite of a settlement, if the nonsettling parties can show 'exceptional circumstances' under Fed.R. Civ.P. 26(b)(4)(B)."). The court noted that "exceptional circumstances might exist where the settling party's expert has unique expertise which may not be readily available to other non-settling parties, or where the settling party's expert participated in tests which cannot be replicated by new experts." *Wolt*, 828 F.Supp. at 1568 n. 18.

Unlike *House*, the experts here have not performed a personal medical examination pursuant to Rule 35, nor scientific tests that are unavailable or unduplicatable. FMC and Vendo/Floway have agreed not to permit BNSF to use FMC's experts. The totality of the circumstances justifies application of the "exceptional circumstances" standard to Vendo/Floway's motion to quash.

### 4. *Applying the Exceptional Circumstances Standard*

As in *Wolt*, there is no showing that FMC's experts have unique expertise, oth-

erwise unavailable to BNSF, or that they "participated in tests which cannot be replicated by new experts." *Wolt*, 828 F.Supp. at 1568 n. 18. In *In re Shell Oil Refinery*, 132 F.R.D. 437 (E.D.La.1990), Shell submitted expert reports in compliance with a court-ordered deadline for experts testifying at trial. *See Shell*, 132 F.R.D. at 439. Shell's later decision not to call some of the authors of the reports as experts at trial was "permissible" and transformed those witnesses into "non-testifying experts," within the meaning of Rule 26(b)(4)(B), whose testimony could be used by another party only upon a showing of "exceptional circumstances." *See Shell*, 132 F.R.D. at 440–42. A showing that over $300,000 was required to replicate those tests was insufficient to demonstrate "exceptional circumstances" where "plaintiffs can obtain the substantial equivalent by having their own experts conduct tests." *Shell*, 132 F.R.D. at 443. BNSF provides no evidence showing the cost of any studies it seeks to use or that such tests cannot be replicated by its own experts.

■ Under Rule 26(b)(4)(B), a party "carries a heavy burden in demonstrating the existence of exceptional circumstances." *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F.Supp.2d 1148, 1151 (N.D.Ill.2001) (citation omitted). Exceptional circumstances may exist where 1) the object or condition at issue is destroyed or has deteriorated after the non-testifying expert observes it but before the moving party's expert has an opportunity to observe it; or 2) there are no other available experts in the same field or subject area. *See Spearman*, 128 F.Supp.2d at 1152. BNSF makes no showing the plume of contamination has deteriorated or is inaccessible to further study by other available experts in the field.

■ BNSF does not show exceptional circumstances exist to warrant an order allowing it use FMC's experts.

### 5. *Applying the Balancing Standard*

Assuming, *arguendo,* the balancing standard applies to this case, BNSF's showing is still inadequate to permit it access to FMC's experts.

"The claimed importance of expert testimony underscores the need for [BNSF] to have timely designated [its] expert witness so that [opposing counsel] could prepare for trial. The importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders." *Geiserman,* 893 F.2d at 792 (footnote omitted). BNSF created the situation in which it finds itself by not cross-designating FMC's experts to give notice it intended to rely on FMC's witnesses without a formal agreement as to their shared use. *See State ex rel. Ward v. Hill,* 200 W.Va. 270, 278, 489 S.E.2d 24 (1997) (holding "that, absent a formal agreement among defendants in a litigation proceeding involving multiple defendants, the circuit court should not generally permit a settling defendant's expert witnesses to testify for the remaining defendants," especially where doing so would violate the settlement agreement). BNSF has not been diligent so as to entitle it to use FMC's experts under Fed.R. Civ.P. 26(b)(4)(B)'s extraordinary circumstances standard. To the contrary, BNSF shows an unjustifiable lack of diligence. BNSF's counsel are experienced and competent in the field of environmental law. It is indisputable that CERCLA litigation inevitably results in a "battle of the experts." It is inconceivable that BNSF's counsel could not have known of the need for experts to defeat the opposing parties' claims.

Rewarding BNSF by allowing it to use FMC's experts under these circumstances has the potential to discourage settlement in contravention of public policy favoring settlement and to upset the expectations of parties, the court, and the policy of the law that encourages diligence and discourages profit from the work product and industry of the opponent. *See Wolt,* 828 F.Supp. at 1568. BNSF observes that the Settlement does not contain an explicit prohibition against BNSF's using FMC's experts without assistance from FMC. However, FMC has made an agreement apart from the settlement that it will withdraw its experts. FMC has further work for its experts and does not want them used by BNSF. The fact that FMC's agreement is not part of the Settlement Agreement does not make it less enforceable or less important.

BNSF's argument that it had inadequate time to prepare and designate other experts rings hollow in light of the fifteen months time it has had to prepare since it was joined in the FMC case. BNSF had over nine months after it was brought into this case to designate and prepare experts. BNSF had previously engaged outside experts to conduct a limited investigation into the site in 1995–96. It was well aware of the issues when it was named as a third-party defendant, allegedly responsible for contributing to remediation costs at the FMC site.

BNSF argues it justifiably relied upon being able to use FMC's experts at trial because it had no indication that FMC would settle and be dismissed from the case. Yet, BNSF was aware of and participated in the extensive efforts to mediate the case. To the extent these efforts took place after the expert designation deadline, BNSF could have sought an agreement with FMC to share FMC's experts, but did not. Even before the expert designation deadline, BNSF could have sought such an agreement and should have known, especially as an experienced party in environ-

mental cleanup litigation,[7] that settlement was a likely possibility which would leave it with only two designated experts.

BNSF has made no showing that the information and opinions of FMC's experts are unobtainable from other experts in the field or that their studies are incapable of being reproduced. There is a strong policy against permitting a non-diligent party from free-riding off the opponent's industry and diligence. *See Ager v. Jane C. Stormont Hospital,* 622 F.2d 496, 502 (10th Cir.1980) (noting that "the structure of rule 26 was largely developed around the doctrine of unfairness designed to prevent a party from building his own case by means of his opponent's financial resources, superior diligence and more aggressive preparation"); *Shell,* 132 F.R.D. at 443 (applying Rule 26(b)(4)(B)'s "intended purposes of protecting trial strategy and preventing one party from having a free ride at the expense of the other party"); *Wolt,* 828 F.Supp. at 1568 ("The rule is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation.").

Now that a new schedule is being implemented in this case, due to the effective consolidation of this case with the *BNSF* action, BNSF will have additional time to retain, designate, and prepare experts regarding its claims against Vendo/Floway. This additional time effectively eliminates prejudice to BNSF caused by the unavailability of FMC's experts. Even under the balancing standard, BNSF's lack of diligence and the prejudice to FMC outweighs the probative value of the testimony of FMC's experts.

Vendo's motion to quash BNSF's proposed subpoenas of Plaintiff FMC's experts is GRANTED.

### C. *BNSF's Application to Modify the Scheduling Order*

BNSF requests modification of the scheduling order because Vendo and Floway's "unilateral cancellation" of as many as 24 depositions leaves insufficient time to re-notice and take all of the previously scheduled depositions by the discovery cut-off date. *See* Doc.185, Application, p. 2:1–9. BNSF contends it will suffer extreme prejudice unless it is permitted to engage its own experts in areas previously covered by FMC's experts. *See id.* BNSF contends Vendo and Floway have rejected BNSF's proposal to consolidate BNSF's RCRA action with this case and extend the pretrial and trial schedule by approximately six months despite a pending motion to dismiss, stay or consolidate in the RCRA action by Vendo and Floway.[8] *See id.* at

---

7. "[I]t is obvious to any sophisticated trial lawyer that in litigation involving multiple defendants there is a likelihood that settlement will occur before trial. To rely on another party defendant's witnesses without some formal agreement as to the shared use is to invite the consequences that arose ... in the present case." *Wolt,* 828 F.Supp. at 1567 (citation omitted).

8. In the *BNSF* action, Vendo and VMC join Floway's motion to dismiss or stay, or in the alternative, to consolidate with *FMC v. Vendo,* CIV F 00–5295 OWW LJO. *See Burlington Northern v. Vendo,* CIV F 01–6434 OWW LJO, Doc.21, filed January 24, 2002 (motion); Doc.25, filed February 5, 2002 (joinder). The moving parties contend the underlying facts in BNSF's claims against them in the *BNSF* action are identical to Floway's third-party claims against BNSF in the *FMC* action. *See id.* at p. 1:24–28. Floway argues BNSF's claims should have been presented as compulsory counterclaims against Floway in the *FMC* action and that BNSF's separate RCRA action should be dismissed or stayed, or at least consolidated. *See id.* at p. 1:28–p.2:4. Floway asserts it "will stipulate that BNSF can file its claims as counterclaims in the *FMC* action." *Id.* at p. 5 n. 1. Oral argument on the motion was heard March 4, 2002. *See* Doc.24, filed February 1, 2002; Doc.30. The parties were afforded an opportunity to file supplemental papers. A further hearing on the motion was held April 8, 2002, at the same time as the motions in the *FMC* action

p. 2:10–15.

Vendo, VMC, and Floway (together, "Vendo/Floway") oppose BNSF's application and its characterization of the events surrounding the settlement. *See* Doc.187, Vendo's Opp., filed February 13, 2002; Floway's Opp. Vendo/Floway contend they did not "unilaterally" take depositions off calendar and that no additional time is necessary to complete the depositions. *See* Doc.187 at p. 2:2–7. The February 8, 2002, letter informing BNSF of the settlement observed that BNSF had noticed no depositions and requested that BNSF inform Vendo/Floway of the identities of any percipient and expert witnesses BNSF intends to depose. *See* Doc.186 at Exh. A. Vendo/Floway kept on calendar the depositions of BNSF's experts and percipient witnesses. *See* Doc.187 at p. 2:16–19. Vendo/Floway contend other depositions were taken off calendar "to save litigation costs and because it appeared that BNSF would cho[o]se to take only some of the depositions noticed by others and was not prepared to proceed under the existing schedule." *See id.* at p. 3:1–4.

Vendo contends that during a telephone call with counsel for Vendo on February 8, 2002, counsel for BNSF, Deborah Miller, did not object to taking the depositions off calendar. *See id.* at p. 3:10–18. Vendo maintains BNSF changed its position on February 11, 2002, requesting Vendo/Floway to stipulate to the consolidation of Vendo/Floway's third-party claims against BNSF in the *FMC* action with Vendo/Floway's related counterclaims and defenses against BNSF in the RCRA action. *See id.* at p. 3:22–27. According to Vendo, BNSF requested the consolidated action be set for trial in November or December 2002. *See id.* at pp. 3–4. Vendo/Floway declined to so stipulate, responding that

they wished to proceed with their motion to dismiss in the *BNSF* action on the grounds that BNSF's claims should have been made as compulsory counterclaims in the original *FMC* action and were not timely filed. *See id.* at p. 4:1–6.

BNSF's application suggests it has designated experts for its defense, but seeks more time to designate experts for its claims against Vendo/Floway. *See* Application at p. 4:3–5 ("... BNSF did not engage experts relating to Vendo/Floway's liability, but instead engaged experts to testify specifically about the BNSF site, the location of a former ice house.").

Vendo and VMC filed their third-party complaint against BNSF on October 11, 2000. *See* Doc.37. Floway filed its third-party complaint against BNSF on October 13, 2000. *See* Doc.38. As a third-party defendant, BNSF was required to "make ... any counterclaims against the third-party plaintiff[s] ... as provided in Rule 13." Fed.R. Civ.P. 14(a). BNSF filed no counterclaims. Instead, BNSF filed answers to both Vendo/VMC's third-party complaint and Floway's third-party complaint on December 1, 2000. *See* Docs.79–80. It then waited over a year after the third-party complaints were filed to file claims in a new and separate action against Weir Floway, Vendo, and VMC. *See Burlington Northern v. Vendo,* CIV F 01–6434 OWW LJO, Doc.1, filed November 13, 2001. BNSF failed to co-designate experts with FMC. BNSF chose not to participate in the settlement which it claims resulted in the need to modify the scheduling order. Diligence, not carelessness, is the basis for granting relief under Rule 16(b). BNSF was not diligent.

BNSF's contention that it will be prejudiced focuses on the experts necessary to

at issue here. A decision under separate cover grants the motion to consolidate for BNSF to assert its claims as compulsory counter-

claims in the *FMC* action. *See BNSF* action, Doc.35.

prove Vendo/Floway's liability, an issue that is now relevant to this action, which as consolidated includes compulsory claims against Vendo/Floway. The issue of modifying the case schedule now involves more than BNSF's diligence in complying with the scheduling order in this case. However, in determining that the claims in the *BNSF* should have been alleged as compulsory counterclaims in the *FMC* action, it is true BNSF bears some responsibility for failing to timely allege its claims.

"[D]elays are a particularly abhorrent feature of today's trial practice. They increase the cost of litigation, to the detriment of the parties enmeshed in it; they are one factor causing disrespect for lawyers and the judicial process; and they fuel the increasing resort to means of nonjudicial dispute resolution. Adherence to reasonable deadlines is critical to restoring integrity in court proceedings." *Geiserman*, 893 F.2d at 792. Although BNSF fails to demonstrate good cause for modifying the scheduling order in this case on the sole ground that it needs more time to depose and prepare experts, which it should have engaged and designated for its defense against Vendo/Floway's claims, in light of the consolidation of the *BNSF* action with the *FMC* action, some modification of the schedule is required. BNSF's offer to consolidate the *BNSF* and *FMC* actions for trial in November or December of 2002 was rejected by Vendo/Floway. *See* Doc.187 at pp. 3–4. Vendo/Floway bear some responsibility for the scheduling dispute. All parties were advised by the court at an earlier scheduling conference that the addition of PRPs would affect the case schedule. There is no reason BNSF cannot try its compulsory counterclaims in the *FMC* action with a minimum of delay. The contaminants, site, and parties are the same. The effective consolidation of the cases was precipitated by Vendo/Floway's motion to dismiss, stay, or consolidate in the *BNSF* action. They must reasonably expect the outcome they requested in that action, dismissal with leave to file compulsory counterclaims in the *FMC* action, to have some effect on the deadlines in this case. Vendo/Floway do not demonstrate how a delay of a few months will prejudice them, while BNSF will be greatly prejudiced if it is not allowed reasonable time to prepare its case against Vendo/Floway.

Under the current schedule, the trial date is May 29, 2002. Pursuant to the schedule announced and accepted by the parties in open court on April 8, 2002, the new trial date is October 29, 2002. The last day to file dispositive motions is August 15, 2002, with a hearing date of September 16, 2002. The expert and overall discovery cut-off date is July 31, 2002. The last day to designate experts is May 20, 2002. The parties shall submit a joint amended schedule consistent with this decision and conforming to the requirements outlined by the court at oral argument and with the Local Rules.

## IV. CONCLUSION

1. BNSF's motion for summary judgment as to Vendo/Floway's CERCLA claims for contribution as to FMC's response costs is GRANTED.

2. BNSF's motion for summary judgment as to Vendo/Floway's CERCLA claims for contribution for their own first instance response costs is DENIED.

3. BNSF's motion for summary judgment as to Floway's claim for contribution under HSAA as to FMC's response costs is GRANTED.

4. BNSF's motion for summary judgment as to Floway's HSAA claim for contribution for its own first instance response costs is DENIED.

5. BNSF's motion for summary judgment as to Floway's state law claim for declaratory relief is DENIED.

6. Vendo's motion to quash BNSF's proposed subpoenas of Plaintiff FMC's experts is GRANTED.

7. BNSF's application to modify the scheduling order on the ground that it needs more time to depose and prepare experts for its defense against Vendo/Floway's claims is DENIED.

8. In light of the consolidation of the *BNSF* action into the *FMC* action, some modification to the schedule is required. Pursuant to the schedule announced and accepted by both parties in open court, the new trial date is October 29, 2002. The last day to file dispositive motions is August 15, 2002, with a hearing date September 16, 2002. The expert and overall discovery cut-off date is July 31, 2002. The last day to designate experts is May 20, 2002. The parties shall submit a joint amended schedule consistent with this decision and conforming to the requirements outlined by the court at oral argument and with the Local Rules.

SO ORDERED.